We will move now to the last case on the calendar, which is Natural Resources Defense Counsel, Inc. v. James Perry. Counsel for that case, can you please come forward? May it please the Court, Thomas Byron from the Justice Department here on behalf of the government. The district court here and the plaintiff's argument misconstrues the error correction procedure that the Department of Energy adopted. That procedure is intended to regulate the comments from the public, the input from the public in the form of requests for correction of errors. It was not intended to constrain the agency's policy authority or its underlying discretion to determine prior to publication whether to promulgate a regulation. That fundamental error led the district court here to enter in appropriate relief. The court entered an injunction compelling the publication of particular substantive rules that the agency had not adopted. That was improper under any of the statutory authorities that the plaintiffs invoked. It's not appropriate under the FOIA because those rules had not been adopted. They are not being enforced. It wasn't appropriate under APCA because APCA doesn't provide for the courts to compel the issuance of any particular regulation. Roberts, you're not contesting, are you, the nature of the injunctive relief? Assuming that we were, let's say we agreed with your opponent's reading of the error correction rule, that it in fact did, it was intended to constrain the agency's discretion at the last minute to basically yank a rule that had otherwise been final. If we thought that in fact the agency committed itself to basically impose a nondiscretionary duty on itself to go forward, you're not taking issue then with the nature of the injunctive relief, are you? We are, Judge Watford, in part because the, as we pointed out, the citizen suit provision that the plaintiffs have invoked here does not actually apply. Yeah, I know. We'll get to that as well. But putting aside that, assuming there's jurisdiction here that we have actually to have a claim to bring, I'm just talking about the form of the injunctive relief, because it is a little bit unusual for any of us as Article III judges to be ordering administrative agencies to publish stuff in the Federal Register. But I'm just saying if we were to reject the two merits arguments you've raised here, is there any issue you have with the form of injunctive relief after that? So if I may, Judge Watford, just sort of turn to you. I think those questions are related, and so it's hard for me to differentiate them in quite the way you've suggested. So let me see if I can try to address them both. I don't want to disrupt the flow of your argument. So if you want to address first the nature of the duty, that's fine. And then you'll just tell me, hey, I'll get to this other point later. That's fine. No, Your Honor. Let me see if I can address both together, if I may. So one of the problems with the injunction, as I think your question just highlighted, is that it's extraordinarily unusual for a court, for an Article III judge, to compel an executive branch agency to publish a particular regulation. We're not aware, and plaintiffs haven't cited any other example like that. It's not just that that's so unusual, but the reason it's unusual is that it contradicts and contravenes the fundamental principles of the separation of powers that we've outlined in our brief. Well, we have ordered agencies to promulgate regulations where Congress has said they're supposed to promulgate regulations, and they haven't done it. So, Judge Schroeder, I think that's exactly right. And I'll point the Court to Southern Utah Wilderness Alliance, in which the Supreme Court said where a statute requires an agency to take an action, but doesn't specify what that action must be, that the courts lack the power to compel the agency to take any particular action. And that's the problem with the relief here. But where Congress has said, before you publish, you must do this, this, this, or before it goes into effect. Because publish means it goes into effect? Well, it means that it's promulgated. Promulgated. Yeah. Okay. So you, in order to promulgate a regulation properly, you have to do this, this, this, this. And so they've done this, this, this, this. And then you say, but they don't have to promulgate the regulation. Now, that seems strange. So, Judge Schroeder, let me turn to the statutory scheme in APCA, because I think that's what you're referring to now, is not the regulation in the error correction procedure, but the statutory requirement. Sorry, statutory requirement. Nothing in the statute requires the agency to adopt any particular energy conservation standard in a regulation. Right. And so that's fundamentally what this case is about. The plaintiffs here have not sought the kind of relief that's contemplated by A3 of the citizen suit provision, which they have, by the way, NRDC in particular has brought suits over the decades seeking that kind of relief to compel the agency to take some kind of action, to promulgate some regulation, without specifying what that regulation says. They haven't sought that kind of relief here, and that's fundamentally the problem with this case. And I think it goes back to Judge Watford's question, too. The nature of the relief that's contemplated both by APCA and fundamentally by 706-1 of the APA, which was what the court in SUWA was addressing, SUWA was addressing, is that the court may superintend the agency's timing, its schedule, its compliance with deadlines, which is one of the things plaintiffs mention here, but they have not sought that relief here. And what's not appropriate is for the courts then to superintend the content of the rule, and that's what the district court here did inappropriately. But I — let me just test this, because I think you're going to agree with me. If the error correction rule had said in very explicit terms, right, we're going to adopt this little — we're going to make a little tweak to the normal notice and comment procedure. We're going to allow for this correction of typos. But, hey, public, we are going to commit to you all, we're going to commit to the world that once the rule has become finalized and we open it up, we put it on the website, we open it up for the correction of these typos, we will not withdraw it. And in 30 days or 45 days, whatever the time period specified, 45 days, I guess, we will, in fact, publish it in the Federal Register. No ifs, ands, or buts. I assume that if the rule somehow said that in those clear terms and then the agency refused to do that, we could say, hey, no, you committed yourself to publishing the damn thing. Go — we're ordering you to do it. You wouldn't object to that, I assume. So, Judge Wofford, I want to just test the premise a little bit, or contest the premise, if I may. I'm not sure it would be appropriate for an agency to do what your hypothetical suggests, which is to bind future agency decision-makers and constrain their policy discretion. That, again, goes to the fundamental statutory — I'm sorry, constitutional separation of powers concerns that we've raised. But let's assume that it was proper for an agency to do that. The nature of that regulation would, as I think your hypothetical suggests, look very different. For example, it would address the policy constraint that the plaintiffs have presumed that's not addressed here. It would say not only submit to the Office of Federal Register for publication, but actually require publication and not permit compliance with the Office of Federal Register's own regulations, which permit withdrawal after submission for publication. That's what the footnote 1 in the May 2016 preamble makes clear was not disturbed, that Office of Federal Register authority to oversee and superintend the publication process, which includes its own error correction. And Kennecott Copper, the D.C. Circuit, made clear that that error correction is not merely for this narrow type of error, but also for substantive correctness. Well, but your premise then is that the publication is a policy decision. And I'm wondering whether that is so. I think so. Or whether it's simply a ministerial thing after everything else is done. So I think, Judge Schroeder, that Kennecott Copper, the sort of the underlying analysis or the underlying background presumptions, including those separation of powers concerns that inform the Court's analysis in Kennecott Copper makes clear that it is a policy judgment. That right up until, and the Second Circuit's slattery cases, too, make that clear, right up until publication, or at least the day before publication when it's open for public inspection, there is a continuing availability for the agency to make a different policy judgment. So you are making now a different policy, that this is now a different policy judgment when you say we're not going to publish what was made before. So you're changing the policy. So, Your Honor, the agency has not yet made the fundamental policy decision, but it retains the authority to do that. And what the district court did here was to interfere with the exercise of that policy judgment. Well, if you're going to change it, then you have to go through the policy, the APA requirements to change policy, don't you? Well, only when there is a regulation in place that has been prescribed and published, and here there is not. So that's fundamentally— But it has been prescribed. It has been through all the— No, Judge Schroeder, it has not. Prescribed—so the Second Circuit said that prescribed is equivalent to published. We haven't taken issue with that. We think it's significant in this context. It has not been adopted, prescribed, published, promulgated. It has not. It is merely a contemplated regulation at this point. The fact that it was signed has no bearing on this. That's what Kennecott Copper makes clear. Same with the Slattery cases. And let me just turn, if I may, to Professor O'Connell's article, which I think addresses why this is entirely proper, and there's nothing nefarious or inappropriate about an agency making a judgment at any point in the process not to continue the rulemaking that it has undertaken. And that process continues up until the point of publication. She makes the point that presidential administrations going back many decades now have made that judgment upon taking office, not just changes in parties but new presidents even of the same party, she pointed out. She also makes the point that it's not just a change in presidential— Making the judgment that we're not going to publish anything that's already been through  Making the judgment—yes, Your Honor. Making the judgment that anything that even has been submitted to the Office of Federal Registers should be withdrawn for contemplation by the new policymakers who are politically accountable. So—and not just presidential elections and changes of administration. She also points out that congressional elections have changed—have caused agencies to change course. Judicial decisions have, too. Plaintiff's argument here would preclude the agency from taking account of a judicial decision. If this court were to have ruled in that 45-day window or what really amounts to about a 115-day window, the way it would play out, if this court had ruled on the agency's authority under APCA, plaintiff's theory would preclude the agency from taking account of that decision prior to publication of the rule. That can't be right. Just as it can't be right, for example, that the agency is precluded from taking account of a monumental change, for example, in the economic situation of the regulated industry or in the technological developments that it had— That would not be the agency changing its policy. That would be the agency abiding by a decision of a—a judicial decision, a decision of another branch. I don't think—that's not—that's not what I was suggesting, Judge Schroeder. I think what I was contemplating is that perhaps a court decision could affect the agency's analysis of its authority, even if it weren't directly controlling. And the agency should still have the opportunity to address that before promulgating the regulation. I—I want to also point out that the Supreme Court in Southern Utah also differentiated will from shall and made clear that will is not the kind of verb that would be susceptible to mandamus or 706-1. And thus, it's not appropriate in this context for plaintiffs to equate it with a mandatory direction either. Can I ask you—I'm sorry to interrupt, but just to go back to something you said a minute ago. You said that it would actually be improper for an agency to constrain itself in the way that the plaintiffs are arguing for. And I—I guess why—yeah, why do you say that? So, Judge Watford, I don't want to—I don't want to pine on a hypothetical that has not been presented because I—I think—I don't know whether it would be improper. I think it would raise concerns. I don't think it's hypothetical. I think it's the very argument they're making. So— You're—you're saying not only did we not intend that, but somehow it would be—you said from a separation of power standpoint, it would be improper. I don't understand the basis for that. Well, so the—the exact—so fundamentally, Professor O'Connell makes this point. Kennecott Copper makes this point, that it is the agency's continuing obligation to exercise its policy authority that's granted by Congress right up until the time of publication. And the idea that that authority can somehow be constrained by either a prior decision maker or a prior administration is—is something that we haven't encountered before, Judge Watford. And I think there's a lot of evidence in the context and structure and text of this regulation, which I'd like—which I'd be happy to address, and I think we pointed out in our brief, that it is not at all about policy discretion. It is instead about regulating public input. So all I want to say about the possibility of the — an agency trying to do something that plaintiffs have suggested was taking place here, but really was not, is that it would be unheard of, it would be extraordinary, and for that reason, the Court should be reluctant to read into ambiguous language— Okay. That's different. All right. I— That was our point. I'm sorry, Your Honor, if I overstated it. You said from a separation of power standpoint, it would be improper. That's at least what I heard in that— I apologize if I—  If I overstated the point, Your Honor. I meant only to say that this regulation does not, and the Court should be reluctant to overread it— Okay. I totally understand that argument. But so why is it—I guess, let me just sort of put forward what I think the plaintiffs will say on this point, which is just that delay here is a big problem, right? And there needs to be certainty on the industry's part. Yes. And so why isn't—why shouldn't we read this as the agency saying, look, we recognize that if we didn't adopt this error correction procedure, the thing would be published today? No, Your Honor. I don't think that's right. Well, hang on. Okay. Sorry. If I could finish my— Apologies. Maybe I'm going in the wrong direction, but I want you to correct, you know, give me some course correction. But if we didn't have this extra little layer of review, we—the agency is saying, look, we have finished our substantive rulemaking process. If we just left things as it is in the ordinary course, this thing would be published next week, a month, whenever the day of publication would ordinarily occur. And we recognize that that's, you know, and there's a need to get the rule out there quickly. We are going to add on an extra layer of delay, which you've said—I was thinking 45 days, but you said it could be up to 115 days. And we recognize all of the harms that that can introduce into the process. So we are going to assure everyone, as I said earlier, we commit irrevocably to publishing this thing, right, notwithstanding this extra period of delay. And that's the reason that we used will in the sense of shall. We really did want to constrain our ability to withdraw it at the last minute because of all of the problems that adding this extra period of delay would otherwise cause. So why is that just not a reasonable way to construe this? So two fundamental answers, Your Honor. First of all, the agency took account of the concerns about delay principally in order to preclude public comments from causing undue delay when the agency was otherwise ready to proceed. That was the reason the agency pointed to the concerns about timeliness and avoiding undue delay, not in an effort to constrain its own authority. And so secondly, that goes to the fundamental point that it would not, these rules after having been signed would not automatically be published. There remained the step for the agency decision maker to submit them to the Office of the Federal Register to allow them to go forward without withdrawing them. But that would happen really quickly, wouldn't it? Not necessarily, Your Honor. So it could happen quickly if the agency was ready to do so. But again, the agency could have waited. Now, all of this goes back, and Judge Schroeder, your questions earlier pointed out that there are some scheduling deadlines in the statute, right? So if the plaintiffs thought that the agency was unreasonably delaying, the remedy would be, as it has been in other district court cases, to have a consent decree negotiated and superintended by a court to ensure the agency takes some action, not that the agency publishes any particular rule that it had contemplated in the past. I do want to reserve some time for rebuttal, if I may. I'd be happy to address any of the Court's other questions, however.  Thank you, Your Honor. We'll hear from your clients, and we'll hear from you in rebuttal. Good morning, Your Honors. Ian Fine on behalf of citizen plaintiffs. We plan to split our time by reserving five minutes for Mr. Perry from government plaintiffs. I'd like to begin by pointing out that defendants below conceded in the hearing before Judge Chabria that an agency could bind itself in this way by committing itself to publish a particular rule. So the only question here is whether the error correction rule actually did that. We believe the text of the rule makes that clear. Whether the error correction rule did what? Whether the error correction rule includes a nondiscretionary duty to publish a rule, to submit a rule either as posted or corrected. Those are the two options that the error correction rule leaves the agency. And the rule makes this a nondiscretionary duty. The text makes this clear. Can I ask just what would have been the purpose of the agency doing that? I posited one pretty ill-informed speculation, because this does seem, your reading seems very strange to me. I grant you the language might get you there, but why in the world would an agency want to do this? So is there some better explanation than I was able to come up with? Certainly, Your Honor. First, I would point to the Sachs case, which we discussed in both answering briefs, and it's never addressed in either reply. The court there, this court, applied mandatory language in a regulation. And it said, we don't know why the agency bound itself in this way. It said, this court held, regardless of the rationale for the regulation, nothing justifies abandonment of the general rule that the plain language of a regulation controls. And in any event, here, the agency did have good reasons to bind itself in this way. First, as Judge Schroeder pointed out, the agency exercised its policy discretion before posting these for public – before posting these for its proofreading process. That's clear. At SER 146, the agency says that it does not post these until it has completed and made all of its policy choices. The agency then made a further policy choice that it did want to commit itself to publish these for some of the exact reasons Your Honor posited. First, it's true that without the error correction rule, these, in fact, would have been published. It takes no more than two weeks in the general course for things to be published. There's a walk-in coolers rule that was also withheld but eventually published later on here, and that took no more than two weeks from signature to publication. And so that Your Honor pointed out, I mean, the policy – agency's policy discretion doesn't exist in a vacuum. It's there to carry out the statutes that they're delegated to administer. So here, Congress, in EPCA, did it for the benefits of these energy efficiency standards, and it did it for regulatory certainty. The anti-backsliding provision and the deadlines are there for these purposes. That's why the agency bound itself in this way. First, it had already determined that these standards were in the public interest. They have enormous public benefits. Here, the agency has estimated they would save consumers and businesses up to $8.4 billion over 30 years. The agency has never disclaimed that earlier finding. So when it adopted the error correction rule, it balanced its desire for accuracy with the desire to avoid unduly delaying these significant benefits. It also did it for regulatory certainty. When the agency posts these final standards for proofreading, it announces it to the public. It has a signature. It bears a signature. They're labeled as final standards. And so it's, you know, they expect that industry will see these and will start to make investments to comply with the standards that are soon to be published. We have letters in the supplemental excerpts here from industry that say they did exactly that and are asking the agency to publish this. I just was curious. Is this a frequent type of regulation, the error correction rule? Your Honor, it is somewhat, it is unique, but it's unique because it reflects the unique anti-backsliding provision that Congress enacted. That is a unique statutory provision as well. And so this is, you know. With respect to the regulation of the error, I guess. I'm sorry. Say that again. With respect to this kind of regulation of error. Of efficiency standards. That's right, yes. And Congress did that for a couple reasons. One, to ensure it was, Congress was unhappy with the history of delay that the agency had. So Congress enacted this to ensure that there would be continually improving efficiency standards. And Congress enacted the anti-backsliding provision to preclude subsequent administrations from undoing the work of prior administrations. That's the Abraham case. So I guess that's why I don't quite understand the urgency of your client's position here. First of all, am I remembering the statutory scheme right that they had, after they make some determination, they have two years to get the rule out or there's some defined period that's set by statute, right? After a proposed amended standard, they have two years to publish a final. Okay. And so have they blown past that now? Well, in the pendency of this case, they have blown past that for one of the amended standard, the commercial package spoilers rule, which is exactly yet another reason why the agency bound itself in this way. It was aware of these statutory limits. Right, right. But you're going to be able to force them to issue some rule that's more stringent than the last, right? They can't go back on, after they make that preliminary determination, they have two years to come up with something that's more stringent, right? So I guess why are you – so what if they don't have to publish these particular rules? It's not like now they can just, you know, completely regress. They're going to be – not only are they committed not to backside, but they have to come up with something that's more stringent going forward. Maybe it's not going to be quite as stringent as this, I suppose. That's the worry. But – Well, Your Honor, so the two-year deadline for amended standard, it only applies to amended standards. So that applies to the commercial package spoilers rule here, but it doesn't apply to the other ones. So what's the status quo? At this moment? These standards, these final – No, no. Suppose that we agree that they don't have to do anything. That they don't have to publish. Then where are we? Well, the agency would be in violation of two statutory deadlines. The commercial package spoilers, one, because of the two-year deadline on amended rules and proposed rules, and also the uninterruptible power supplies, which is the battery, one of the four here. So they would be in violation of two statutory duties, but not for the other two. So presumably the agency could leave these final standards that were posted almost two years ago now, could leave them in regulatory limbo and, you know, to the detriment of the public. You know, it would be deprived – it would deprive the public of these And it would injure industry that, you know, these letters in the supplemental excerpts of industry that, in good faith, relied on these final standards that were posted on the agency's website. It would continue to injure them. So – Counsel, let me ask you a quick question. So the agency puts out this for public comment. The public comment comes back in, and they go, whoops, there's something here that is substantive. And if we promulgate these rules, if we publish this, this is going to cause more harm than good. Your contention is that a district judge can make the decision that, no, they're wrong, it's not going to do more harm than good, I'm going to order them to publish. That's your – that's your view. Well, so first, Your Honor, the notice and comment process occurred well in advance of these final standards being posted. So these did undergo notice and comment. They went to industry, and the public submitted comments. All of those – I understand that, but somebody looks at it later and goes, uh-oh. Right. So once they're posted, that's the completion of the agency's policy. It has made all of those judgments. At that point, the agency was concerned about typos, but it was not concerned about these sorts of problems that Your Honor is positing. That's why it rejected interveners' requests to make this a reconsideration process. If it had been concerned about those, it would have granted that request and allowed their – allowed interveners or other parties to make those sorts of arguments. But what about your opponent's suggestion? This isn't the specific one he offered, but some catastrophic intervening event occurs. It's totally unforeseen. Nobody could ever have predicted it, and it, in fact, results in the hypothetical that Judge Ezra is positing. Why would the agency want to constrain itself to, like, well, too bad. This is actually going to be disastrous for the environment or for whatever. But we have to publish it because we committed ourselves to doing that. Why would any agency want to bind itself in that way? Well, the agency envisioned this proofreading process to be very narrow and streamlined. So it didn't – it didn't – wasn't concerned about these sort of, you know, extreme hypotheticals occurring in that brief 45-day window. The agency here – that has not occurred in this case. Clearly, the agency has never argued that it was. If the agency now, you know, now is concerned about those wild hypotheticals, it can amend this rule moving forward and build in that additional process for reconsideration. But it did not do that in this rule. That's clear. Sorry. The problem is that this is the United States Court of Appeals. This isn't a district judge like me making a decision. So whatever decision comes out is not just going to apply here. It's going to apply across the board. So I'm just wondering whether a district judge has that kind of enormous power. I mean, I think not. So a couple answers, Your Honor. So first, this is – the district judge would simply be applying the regulation as it exists. If this hypothetical is a real concern, the agency can amend this rule moving forward to take care of it. That's not at issue in this case. So this Court doesn't need to be concerned about that here. And in those cases, I mean, first of all, if there was some sort of catastrophic event, I don't know that, you know, plaintiffs like us would actually bring suit to force the agency to publish a standard that had those sorts of problems. And in terms of the scope of the injunction here, Your Honor, defendants point to the language in SUA. SUA is very clear when it discusses that. It's like that if there's a duty, but the statute leaves discretion to the agency, the court at that point can only order the agency to act, but not to take a particular act. But here, the duty that we are seeking to enforce is that the agency will submit for publication these final rules, either as posted or corrected. That's what the agency bound itself to do. And there's no reason in this case why Judge Chabry's decision shouldn't be affirmed. Well, and why doesn't the, I guess what I was expecting, given your insistence that what was intended by use of the word will was to, you know, this kind of binding of discretion that otherwise would exist. I guess I thought that something, and there would be some mention of that in the Federal Register materials that we have, and there just simply isn't. And that strikes me as telling because it sounds like you agree that this is pretty much unprecedented. We don't really know of any other agency that's ever done anything quite like this. And so if the agency were really going to adopt this pretty unique discretion constraining rule, why wouldn't there be some discussion of that? Well, so a few answers, Your Honor. First, I would go back to Sachs again and really encourage Your Honors to take a close look at that opinion. There, the court again applied statutory, I'm sorry, mandatory language in a regulation that the agency shall do X despite its discretion not to have done that previously. And the defendants in that case argued the same thing they're arguing here, which is if we were going to disclaim such authority, we would have had to say so expressly. And the court rejected that argument. It said that the mandatory language that it shall do X was enough. It says we will not require that an agency articulate all of the acts the agency may not engage in simply to guarantee that mandatory prescriptions are followed. And going back to Your Honor's question here, we're not just relying on one instance of will. I think that the rule actually sets out the agency was balancing its desire for accuracy with its desire to avoid delay. And so it bookended a posting obligation in subsection C, which uses the word will in which defendants concede is mandatory, with its publication obligation in subsection F, where it again used the same term, will. So it has consistently used will in a mandatory sense. Defendants argue that when the agency said will, it just meant to describe what the agency will ordinarily do or what it expects it ordinarily will do. But the agency, when it wanted to say that, said exactly that. To point Your Honors to subsection F5, where the rule, error correction rule, actually uses the phrase will ordinarily when it wanted to be merely descriptive rather than prescriptive. Your Honor asked about the Federal Register. I'd point Your Honor to a few places. One, at SER 136, it says that the error correction rule prescribes a timeline in which the agency will submit these rules for publication. It repeats that same phrase at SER 132, SER 137. At SER 149, it says that subsection F describes how the agency will eventually publish these final rules. Your Honor, defendants have suggested that the rule is merely to regulate the information that comes in, but not to bind the agency in any way. If that were correct, the rule would have stopped at subsection D. It goes on. Subsection F is the publication obligation where there's with this additional obligation that the agency committed itself to. So just your view looking at F5 is that every time the agency used the word will, it should have qualified it by saying something like ordinarily or most of the time, but we're reserving the right to withdraw the thing like we normally could. I mean, that just strikes me as odd because the use of the word will here does make sense. It's basically saying unless we were to change our mind at the last minute like we always have been able to, and that's what I'm saying. If in fact what they really meant was not only just will in the ordinary case, but no matter what, come hell or high water, we are committing ourselves irrevocably to publishing this thing, there would have been some discussion of such a pretty dramatic departure from ordinary agency practice in the Federal Register materials. Well, I do think that the agency's rejection of the reconsideration, that interveners request that this be expanded to encompass reconsideration, that its rejection of that is for the same reasons why it presents itself here. But all they're saying there is that no, we are not going to be obligated. To me, that's how I read that. We are not going to be obligated to review substantive. You can file whatever the hell you want, but if it doesn't involve a typo, we are not obligated to respond to that. That doesn't speak to, but if something on our own, as Judge Ezra was positing, if something comes up on our own and we're like, oh, my God, this is a catastrophic mistake. Thank God we haven't published this yet. There's nothing that says none of that will matter by virtue of using the word will. We've irrevocably committed ourselves to publishing. Your Honor, I would point out that this distinction between will and will ordinarily is not just in this one place in the text. If you go through the regulatory history and you read the preambles, you'll see that the agency frequently used the phrase will ordinarily when it wanted to be descriptive and used will when it was describing something mandatory. It's not just that one instance. There are other indications in the text as well. Subsection G says that the agency may correct the rule before publication. It does not, as Judge Chabria pointed out, say that the agency may withdraw or amend. This is also reflected in the mandatory disclaimer in subsection C3. So when the agency posts these for proofreading, this disclaimer tells the public that the rule is subject to correction before publication, which does not tell the public that this is subject to withdrawal. And by saying it's subject to correction before publication, it is indicating that these will, in fact, be published. You've eaten into your co-counsel's time. We'll give the full five minutes, but just concluding point. I guess I will come back to that this may well be a unique rule and a unique duty that the agency has posed here, but it is reflecting the unique statute in the anti-backsliding provision. And to the extent it is unique, I think affirming Judge Chabria here will not have far-reaching implications. It will require the publication of these standards. If the agency is concerned about these hypotheticals moving forward, it can amend the rule. There's nothing preventing it from doing that. But it can't distort the text of the rule that it earlier promulgated to do something that the text does not have. Yes, it would have to amend the error correction rule through the proper, whatever proper procedures are in place. That's right, Your Honor. An agency is bound to its regulations. It's bound to the text of the error correction rule as it exists now, and that is what this Court is enforcing. Okay. Thank you, Counsel. Thank you. Can we put five minutes even on the clock, please? You'll get your full five, but I probably will hold you pretty closely to it. Still, good morning, Your Honors. I'm Semer Zeperi on behalf of the people of the State of California and their 14 government co-plaintiffs. The government plaintiffs brought this lawsuit to unlock the substantial benefits that Mr. I have a few points here. Mr. Fine was able to cover most of them. Returning to the broader question here, the defendants frequently reference a supposed inherent discretion that they say that they are exercising or that they can exercise in order to delay or refuse to publish these rules. However, a more fundamental principle is that agencies must comply with their regulations as required by the rule of law. As Mr. Fine noted, the Department of Energy conceded in district court that it can bind itself in this way, and thus we only ask the Court to make the narrow decision that here the error correction rule binds the Department of Energy to publish the efficiency regulations that they have spent years working on and that they determined were justified under APCA. Mr. Fine covered most of the textual arguments that we made in our briefs. I would like to hit on a few points in the regulatory history. First, as you said, the Department of Energy is balancing the benefits of delay in order to correct the standards with, on the other hand, the delay of the benefits of the energy efficiency standards. At SCR 148, the Department of Energy rejected a longer period because it determined that a longer delay would not serve the purpose for which APCA was promulgated, which is continuing reiterative efficiency standards that increase the energy efficiency standard of these products. The Department of Energy said that the process should be rapid and streamlined at SCR 148, and I don't believe that they have met that goal here. The Department of Energy in the regulatory history also said that the central features of the error correction rule were, one, that they delay a rule, and, two, that they consider error requests before publishing. So throughout the regulatory history, we see the presumption that publication will occur because the Department of Energy went through its extended rulemaking process in order to determine that the standards were justified. Just I'm curious if you have a different answer from your colleague. If the agency had wanted to write the rule in the way that your opponent has suggested, what is it that they would have said instead of will? What's the alternative language that we would have seen? They could have used may. That would have maintained their discretion to determine, to decide after the error correction process that they wanted to take that final step and publish it. Here they used will. As Mr. Fine pointed out, they also used will ordinarily in F5. They also used that in the regulatory history when they were saying what they would most of the time do. But I don't, I mean, it's not that easy a fix, it seems to me. If the agency wants to limit the error correction part of the process to true typos, fixing typos, right, it does have to say our policymaking process really has come to an end in the sense that we're no longer going to entertain any further input from the public in terms of substantive matters, right? So that's why I understand the use of the word will because it's suggesting that don't come back at us with, you know, just kind of regurgitating the substantive fights we've already resolved. Sure, and there are multiple places where the error correction regulation uses will to limit the input that the Department of Energy will consider. It says that it will not consider new policy arguments that aren't based on a, or that are independent of an error in the text. But really if the Department of Energy didn't want to bind itself to publishing the rules, they could simply make a input acceptance process as opposed to this one where they did include the mandate of will submit for publication. They could have just left subsection F out and just said this is purely a process for the acceptance of information on potential errors. I see my time is up. They did define what they meant by errors, which are simply numbering mistakes, calculation mistakes, or some unintended inconsistency. Correct. So that was the only type of input that they were seeking through this, and then they imposed the publication mandate on themselves. Okay. Thank you, counsel. Thank you very much. Appreciate the argument. I think you have a little over two minutes for rebuttal. Thank you, Your Honor. I just want to make a couple of brief points. First of all, the question about why the agency would want to constrain its discretion, which I think you posed to plaintiffs, is exactly the question that we think needs to inform the analysis of the context and structure and the text of the error correction rule itself. And I'll point out that the plaintiffs pull out the will submit for publication out of context. Every time in subsection F that phrase is used, it's in the context of public submissions, either submissions that were received or were not received or the agency decided to accept or not. And so it's not appropriate to divorce it from that context. I don't understand. Why does that context matter? Well, it matters because the entirety of the error correction process is designed to regulate and constrain public input, not the agency's consideration of any matters that might come before it, either through error correction or, as Judge Ezra pointed out, on its own cognizance. So if there were a fundamental catastrophic change in the industry conditions, as one of your hypotheticals posed, Judge Watford, I think the agency needs to be able to accommodate that, account for that. I really don't see that as being an intent of this error correction process. So, Judge Schur, I think that's exactly right, and that's our point. It has nothing to do with the error correction process, which is instead only addressed to the input from the public that is being constrained. So the agency retains the power. The question is whether or not it is limited, what it can do during this period, to receiving and acting upon errors that are called to its attention. And you're arguing, well, it can change its whole policy and decide not to do anything and go back to the previous rule. I don't see that as being inherent in this regulation. So, Judge Schur, I think, if I may just come at it from a slightly different direction, I think what you pointed out is exactly consistent with and fundamental to our argument, if I may continue just to answer your question, Your Honor. The fact that the text and purpose of the rule have nothing to say about the agency's fundamental policy authority, which O'Connell, Canicot, other authorities make clear, continues up until the point of publication. The fact that the rule says nothing about it supports our view that ambiguity in the rule should not be read to sort of support plaintiffs' idea that there was an intent to constrain the agency's own policy authority. I don't want to go over the time allotted. I'd be happy to answer the Court's questions. I have a couple more points. I have one more question for you. Thank you, Your Honor. So, very briefly, the agency should be allowed here to complete its review, which has been interrupted by this litigation. The agency will address these four policy questions, but it has waited to do so until the constraint that's imposed by the injunction here has been resolved. That actually was my question. Yes, Your Honor. I didn't follow up with Mr. Fine, but so the two years has run on one of these rules, but I don't understand the statutory scheme well enough to understand. The other two are brand new, and so therefore they're not subject to the two years? So the two-year limit that's imposed by statute is from the notice of proposed rulemaking to the final rule. I think I don't remember the details, Your Honor, so I don't want to get this wrong. I'd be happy to address it in a supplemental submission if it's helpful. The point that I think we come back to with respect to all of these statutory deadlines is that if there is a concern that the agency has unreasonably delayed, the 706-1 concern that Suha addressed, the remedy is not to compel the publication of that particular proposal, that substantive proposal, but instead to compel the agency to take some action. If you look at the plaintiff's complaint and their request for relief here, they have not sought that relief in this case, and that's what's extraordinary about the remedy that they've sought here. So you wouldn't have a problem if the district court had simply said, you must take action within a certain period of time? So, Judge Ezra, that's exactly right. If the case were brought seeking that relief, and the reason I point to the request for relief in the plaintiff's complaint here, they do not seek that relief. That's what NRDC in prior litigation in the Southern District of New York and the District of Columbia did seek, did achieve, and the agency proceeded in most cases. What would be the difference? So the difference, Your Honor, is that the agency would retain its policy authority to make a judgment about what the standards should be and whether they satisfy the statutory requirement that they be technologically feasible, economically justified, and have a significant energy conservation element to them, so energy savings. They did that? No, Your Honor, they have not. So they made a preliminary determination, but that determination is not final until it is published. I understand. That's the point that we keep coming back to, Your Honor. So, Judge Ezra, again, this goes to the nature of the relief, which Judge Watford, you and I were discussing at the very beginning of the argument, and I think it's important to recognize the unusual nature of what the plaintiffs have sought and to view with some skepticism their idea that this regulation and this statutory scheme allows this kind of relief. We urge the Court to reverse the injunction. Thank you, Your Honor. Thank you, counsel. The case just argued is submitted. We are in recess until tomorrow.
judges: Schroeder, Watford, Ezra